## Commonwealth *v.* Walker, Appellant.

148

Argued September 16, 1966. Before ERVIN, P. J., WRIGHT, WATKINS, MONTGOMERY, JACOBS, HOFFMAN, and SPAULDING, JJ.

*John W. Packel,* Assistant Defender, with him *Melvin Dildine,* Assistant Defender, and *Herman I. Pollock,* Defender, for appellant.

*John A. McMenamin,* Assistant District Attorney, with him *Alan J. Davis,* Assistant District Attorney, *Richard A. Sprague,* First Assistant District Attorney, and *Arlen Specter,* District Attorney, for Commonwealth, appellee.

OPINION BY WATKINS, J., December 16, 1966:

This appeal is from the judgment of sentence of the Court of Quarter Sessions of Philadelphia County entered upon the conviction of the defendant, Culber Walker, of conspiracy, assault and battery, aggravated assault and battery, and aggravated robbery before Judge REED sitting without a jury. Motions for a new trial and in arrest of judgment were denied and the appellant was sentenced from one to ten years imprisonment on one indictment. Sentence was suspended on the others.

The facts were as follows: On Saturday, July 1, 1961, about 4 o'clock p.m. two men entered the store of Harry Cohen and placed a gun at his back. As Cohen turned he was hit on the head with the butt of the gun. Blood spewed from his wound. Beatrice Cohen, his wife, was also knocked down by one of the robbers. The masked robbers took $200 and fled. Neither Cohen nor his wife could identify them. There is evidence that three men fled in the getaway car. Jacqueline Moore, a bystander, had passed the car prior to the incident of the men coming out of the store and saw a man peering into the engine of a light colored Chevrolet parked outside the Cohen store. She noticed that the car had New York license plates. When she saw the masked men leave the store, one of them brandishing a gun, she called the license number to another bystander, Rev. E. L. Richo, who wrote it down and later supplied it to the police.

At about 8 o'clock p.m. of the same day the appellant approached two policemen in a patrol car. He

asked them if the police were interested in a New York white Chevrolet, saying that he had heard a broadcast to that effect and as he was in Philadelphia for a good time he did not want to be bothered. The officers in question called in for knowledge of the broadcast and were advised that the car was not wanted for anything. The appellant showed the officers his owner's card and gave them his license number, which coincided with the license number given to the police of the getaway car outside the Cohen premises. Among his identification cards was a membership card in the Woodbine Club, located at Twelfth Street, south of Master. The officers did not detain him but later learned that a New York car of the same license number and description was wanted as a result of the Cohen robbery. At about 11 o'clock p.m. they went to the Woodbine Club where they found the appellant in the company of a woman. At the time the police found them at the entrance of the club they noticed that he handed something to the woman and she left and didn't return for some time. They took him to the police station for investigation and upon frisking him found three bills in his possession stained with human blood. The police asked him how they became so stained and he replied that his thumb had been injured. An examination of the thumb disclosed no sign of injury.

The appellant first contends that the evidence is insufficient to sustain the verdict. The evidence was circumstantial. None of the witnesses were able to identify the appellant nor able to describe their appearance because of the effective masks they wore. The evidence of the Commonwealth did prove that the appellant, a New Yorker, was in Philadelphia on the day of the robbery; that his car was outside of the Cohen store; that his car provided transportation for the robbers; that the robbers were seen getting into the car; that the victim of the robbery and assault bled profusely so

that there was blood everywhere; that bills stained with human blood were in his possession after the robbery and that he gave a false explanation to account for the blood; that he voluntarily approached the police after the robbery to ascertain whether the police were looking for his car.

". . . the circumstances proved should be such as reasonably and naturally to justify an inference of the guilt of the accused, and of such volume and quality as to overcome the presumption of innocence and satisfy the jury of the accused's guilt beyond a reasonable doubt:" *Com. v. Nasuti,* 385 Pa. 436, 445, 123 A. 2d 435 (1956). See also: *Com. v. Kloiber,* 378 Pa. 412, 425, 106 A. 2d 820 (1954). In this case, after the introduction of the Commonwealth's case, the appellant demurred to the evidence and this was denied. The appellant then rested. The circumstantial evidence clearly placed the appellant at the scene of the crime and the use of his car by the robbers. Taking all of the circumstances together, including the bloody money, and his explanation of it, all pointed conclusively to the appellant's guilt.

The appellant further contends that the admissibility of his statement as to his whereabouts violated his constitutional rights under *Escobedo v. Illinois,* 378 U. S. 478, 12 L. ed. 2d 977, 84 S. Ct. 1758 (1964). This case applies where the "suspect has been taken into police custody, the police carry out a process of interrogations that lends itself to eliciting incriminating statements . . .". When the appellant voluntarily approached the officers in the patrol car and told them he was in Philadelphia for the night and did not want to be bothered he was not then in custody. The officers told him, he could go because they thought he wasn't wanted. The voluntary statements made by the appellant were not elicited by interrogation but were volunteered to the officers by the appellant and the appellant was not in custody at the time.

The appellant further contends that after the police went to the club the appellant was arrested and taken to the police station; that the statement elicited from him by interrogation was inadmissible because he was not warned of his constitutional rights; that he was not told that he had the right to remain silent; and that he was not advised that he could consult counsel, although it is admitted that at no time did he request counsel. The appellant, therefore, claims that the statement made in explanation of the bloody money was inadmissible and because it was admitted he was entitled to an arrest of judgment or to a new trial.

In support of this position the appellant relies upon *Com. v. Negri,* 419 Pa. 117, 213 A. 2d 670 (1965) and the cases that follow it. *Com. ex rel. Lawrence v. Myers,* 419 Pa. 145, 213 A. 2d 347 (1965); *Com. ex rel. Geiger v. Maroney,* 419 Pa. 147, 213 A. 2d 348 (1965); *Com. ex rel. Johnson v. Myers,* 419 Pa. 155, 213 A. 2d 359 (1965); *Com. ex rel. Hobbs v. Russell,* 420 Pa. 1, 215 A. 2d 858 (1966) and *Com. ex rel. Mullenaux v. Myers,* 421 Pa. 61, 217 A. 2d 730 (1966).

The Supreme Court, however, in *Negri,* pointed out that *Escobedo* had been construed in Pennsylvania to be limited to its particular facts and that it was held that where a person accused of crime is in police custody, he is entitled to the assistance of counsel to protect his rights, if such assistance is requested. His failure to so request is treated as a waiver. *Escobedo* was so construed in *Com. ex rel. Linde v. Maroney,* 416 Pa. 331, 206 A. 2d 288 (1965); *Com. v. Patrick,* 416 Pa. 437, 206 A. 2d 295 (1965). The Supreme Court in *Negri* further pointed out that other state and federal jurisdictions have given a much broader interpretation to *Escobedo* and concluded at page 121: ". . . that the assistance of counsel must be afforded the accused (if not intelligently and understandingly waived) at the interrogation level; otherwise, any incriminating state-

ments obtained are constitutionally invalid and inadmissible at trial, even in the absence of a request for such assistance." The Court in *Negri* heavily relied on *U. S. ex rel. Russo v. New Jersey*, 351 F. 2d 429 (3d Cir. 1965), which held: ". . . that no request by the accused is necessary to impose upon the interrogating police the duty to furnish the assistance of counsel in this situation in the absence of a warning to remain silent or an intelligent and understanding waiver." The Supreme Court then said in *Com. v. Negri*, supra, at page 122: "Consequently, in order to alleviate and correct a regrettable situation, the clear indication for this Court is to accept and follow the decision of the Third Circuit on this matter until some further word is spoken by the Supreme Court of the United States."

The Court in *Negri* further decided that the rule in *Escobedo* should not be applied retrospectively except to those cases not finalized on the date of the decision, June 22, 1964.

As we understand *Negri*, all cases finalized prior to June 22, 1964, are bound by the rules then in effect in Pennsylvania and statements made in police interrogations at the accusatory stage were legally admissible regardless of warnings as to constitutional rights or offer of counsel, requested or not. But that all cases not finalized by the date of that decision were bound by *Escobedo* and, until *Negri*, the rule in that case was limited in Pennsylvania to its facts and counsel was only required when requested. The failure of such request being treated as a waiver. *Negri*, on the basis of *U. S. ex rel. Russo v. New Jersey*, supra, broadened this interpretation to make such statements inadmissible without the prerequisite warnings and offer of counsel, unless intelligently and understandingly waived.

On June 13, 1966, the Supreme Court decided *Miranda v. Arizona*, 384 U. S. 436, 16 L. ed. 2d 694, 86

S. Ct. 1602 (1966), which went much further than *Negri* and held that the requirements for admissibility set forth in *Negri* were now clearly the law. This included all the warnings and the offer of counsel without request.

However, the further word from the Supreme Court of the United States that the Pennsylvania Supreme Court indicated in *Negri,* it was awaiting, was spoken on June 20, 1966, one week after *Miranda v. Arizona,* supra, in *Johnson v. New Jersey,* 384 U. S. 719, 16 L. ed. 2d 882, 86 S. Ct. 1772, June 20, 1966. This case held that *Escobedo* applied only to cases that began subsequent to June 13, 1966 and was not retrospective. Based on this opinion the New Jersey appeal from the Third Circuit Court of Appeals decision in *U. S. ex rel. Russo v. New Jersey,* supra, prevailed. The writ of certiorari was granted, the judgment vacated and the case remanded for further proceedings in the light of *Johnson v. New Jersey,* supra. *New Jersey v. Russo,* 384 U. S. 889, 16 L. ed. 2d 995, 86 S. Ct. 1914 (1966). Chief Justice WARREN, who it should be noted wrote the majority opinions in *Miranda v. Arizona,* supra, and *Johnson v. New Jersey,* supra, said at page 733:

"Apart from its broad implications, the precise holding of Escobedo was that statements elicited by the police during an interrogation may not be used against the accused at a criminal trial, '(where) the investigation is no longer a general inquiry into an unsolved crime but has begun to focus on a particular suspect, the suspect has been taken into police custody, the police carry out a process of interrogations that lends itself to eliciting incriminating statements, the suspect has requested and been denied an opportunity to consult with his lawyer, and the police have not effectively warned him of his absolute constitutional right to remain silent . . .' 378 U.S., at 490-491, 12 L. ed. 2d 986.

"Because Escobedo is to be applied prospectively, this holding is available only to persons whose trials began after June 22, 1964, the date on which Escobedo was decided.

"As for the standards laid down one week ago in Miranda, if we were persuaded that they had been fully anticipated by the holding in Escobedo, we would measure their prospectivity from the same date. Defendants still to be tried at that time would be entitled to strict observance of constitutional doctrines already clearly foreshadowed. The disagreements among other courts concerning the implications of Escobedo, however, have impelled us to lay down additional guidelines for situations not presented by that case. This we have done in Miranda, and these guidelines are therefore available only to persons whose trials had not begun as of June 13, 1966. See Tehan v. Shott, 382 U. S., at 409, 15 L. ed. 2d at 455, note 3, with reference to Malloy v. Hogan, 378 U. S. 1, 12 L. ed. 2d 653, 84 S. Ct. 1489 (1964), and Griffin v. California, supra."

The line drawn by *Negri* of retrospectivity to be applied to those cases not final at the time of *Escobedo* was a different line than drawn in *Johnson v. New Jersey,* supra, where the line was drawn to be applicable only to cases that began subsequent to *Escobedo.* This being now the law *Escobedo* did not apply to *Negri* because that case began prior to the decision. For the same reason *Escobedo* did not apply to the instant case.

In view of *Johnson v. New Jersey,* supra, the law now seems to be that in all cases that began prior to June 22, 1964, the date of *Escobedo,* statements are admissible regardless of prior warnings or offer of counsel at police interrogations at the accusatory level; in all cases that began subsequent to June 22, 1964, the rule of *Escobedo,* as limited by the interpretation in

Pennsylvania which require a request for counsel, is the law until June 13, 1966, the date of *Miranda v. Arizona,* supra, when all cases beginning thereafter shall be bound by all the prerequisites clearly set forth in that case.

The Supreme Court of Pennsylvania in *Com. v. Schmidt,* 423 Pa. 432, 224 A. 2d 625 (1966) filed November 22, 1966, said in reference to *Negri*: "Subsequently in June 1966, the United States Supreme Court spoke further on the question under discussion in its decisions in Miranda v. Arizona, supra, and Johnson v. New Jersey, supra. A close study of the opinions in these cases compels the conclusion that our original interpretation of Escobedo was correct. In other words, under Escobedo, supra, an individual is not unconstitutionally deprived of the assistance of counsel during police questioning, unless he requested such assistance and was not effectively warned of his right to remain silent. We now accept this final definitive ruling of the United States Supreme Court as controlling on the question."

The nuances of the criminal rules enunciated in the raft of recent cases have been easily grasped on behalf of the chronic and hardened criminal and promptly taken advantage of to the disadvantage of society in general; the law enforcement agencies to the contrary have been up against utter confusion. This is also true of the courts and the bar. We agree with what Mr. Justice WHITE had to say in his strong dissent in *Miranda v. Arizona,* supra, at page 763:

"I have no desire whatsoever to share the responsibility for any such impact on the present criminal process.

"In some unknown number of cases the Court's rule will return a killer, a rapist or other criminal to the streets and to the environment which produced him, to repeat his crime whenever it pleases him. As a conse-

quence, there will not be a gain, but a loss, in human dignity. The real concern is not the unfortunate consequences of this new decision on the criminal law as an abstract, disembodied series of authoritative proscriptions, but the impact on those who rely on the public authority for protection and who without it can only engage in violent self-help with guns, knives and the help of their neighbors similarly inclined. There is, of course, a saving factor; the next victims are uncertain, unnamed and unrepresented in this case.

"Nor can this decision do other than have a corrosive effect on the criminal law as an effective device to prevent crime. A major component in its effectiveness in this regard is its swift and sure enforcement. The easier it is to get away with rape and murder, the less the deterrent effect on those who are inclined to attempt it. This is still good common sense. If it were not, we would posthaste liquidate the whole law enforcement establishment as a useless, misguided effort to control human conduct."

Judgment affirmed.