Joseph A. PELLAND, Plaintiff,

v.

State of RHODE ISLAND, Department of Corrections, and Ashbel T. Wall, II, individually and in his official capacity as the Director of the Rhode Island Department of, Corrections, Defendants.

**C.A. No. 01–454S.**

United States District Court,
D. Rhode Island.

May 7, 2004.

Richard A. Sinapi, Esq., Sinapi Formisano & Coleman Ltd., Cranston, RI, for Plaintiff.

Rebecca Tedford Partington, Esq., Genevieve M. Allaire Johnson, Esq., Attorney General's Office, Providence, RI, for Defendants.

## *DECISION AND ORDER*

SMITH, District Judge.

The right to travel from state to state, though not explicitly guaranteed by the United States Constitution, has long been recognized as a liberty interest protected by the Fourteenth Amendment. In this case, a convicted sex offender on probation seeks greater freedom of movement than the State of Rhode Island is willing to allow him. The question for this Court is whether Rhode Island's enforcement of a policy that curtails the right of sex offender probationers to travel interstate violates the Due Process or Equal Protection Clauses of the Fourteenth Amendment or the Ex Post Facto Clause of the Constitution.

On September 24, 2003, the Court conducted a bench trial of this matter. After reviewing the evidence and considering the parties' arguments, the Court finds that Plaintiff has failed to establish that Defendants violated his rights of due process and equal protection under the United States and Rhode Island Constitutions. Furthermore, the Court finds that Plaintiff

has not proven a violation of the Ex Post Facto Clause of Article I, § 12 of the Rhode Island Constitution or Article I, § 10 of the U.S. Constitution. Judgment shall therefore enter for the Defendants and against the Plaintiff.

## I. *Findings of Fact* [1]

Plaintiff Joseph A. Pelland (Pelland or Plaintiff), a resident of North Providence, Rhode Island, pled guilty to second degree child molestation in Kent County Superior Court on January 10, 1990. He received a ten year suspended sentence to the Adult Correctional Institutions in Cranston, Rhode Island, and fifteen years probation and sex offender counseling. On the day of his plea, Plaintiff signed a form entitled "Conditions of Probation" that contained the following provision:

> During the probationary term herein fixed, you shall abide by the following terms and conditions:
>
> .    .    .    .    .
>
> Second, You shall not leave the State of Rhode Island without the permission of the Court.

The parties are in agreement that Plaintiff could satisfy the "permission of the Court" requirement by obtaining permission to leave Rhode Island either from the court that sentenced him or from the Department of Corrections (Department).

For roughly the next ten years, Plaintiff traveled outside Rhode Island both with and without "permission of the Court," as defined above. He would travel out-of-state without seeking or obtaining the permission of the Court for single days at a time to work, shop, visit family and friends, and attend sporting, political and cultural events.[2] Pelland testified that it

---

1. The parties have submitted a set of Stipulated Facts from which this Court draws the large part of its Findings of Fact.

2. The parties often refer to this occasional travel of short duration as "casual" travel.

was his understanding, based on the representations made to him by his probation officer and the unwritten policy then in effect, that it was unnecessary to obtain formal permission from the Department for casual travel lasting less than twenty-four hours. On three occasions, Plaintiff obtained permission from the Department to travel out-of-state for longer periods of time, either for vacation in New Hampshire or to visit with family in Florida.

In April or May 2000, Plaintiff obtained employment as an automobile parts deliveryman for Empire Auto Parts (Empire) in Foxborough, Massachusetts. Sometime thereafter, Plaintiff sought a permit from the Department to engage in this employment, despite his understanding that he did not need a permit for out-of-state travel lasting twenty-four hours or less.[3]

On November 28, 2000, the Department made effective a new policy and procedure regulating the out-of-state travel of sex offender probationers (Policy). The Policy banned all out-of-state travel by sex offender probationers subject to five exceptions: (1) emergency, defined as death or serious illness of a family member; (2) appropriate to treatment goals, the reason for which must be discussed with and sanctioned by the therapist working with the offender; (3) employment, where the offender works in a bordering state in a job that presents no risk to the community, and the offender was employed in that job prior to the implementation of the Policy; (4) medical, defined as the offender's medical treatment in a bordering state or travel to another state for a medical consultation that is verified; (5) religion, where the purpose of the out-of-state travel is to attend religious services provided that

there is no risk to the community, and the offender has at least a one-year history with the church.[4] The Policy tacitly bars both casual, same-day travel and more extended travel for vacation.

On January 4, 2001, Plaintiff met with his new probation officer, Christine Imbriglio, to discuss the Policy. At the time of that meeting, Plaintiff had left Empire and was working for Domino's Pizza. Plaintiff was concerned that the Policy might affect his ability to continue to work for Domino's Pizza, but he was informed by Ms. Imbriglio that the Policy did not apply to him. In April 2001, Plaintiff had ceased employment at Domino's Pizza and had begun to work as an automobile parts deliveryman for Astro Automotive (Astro) in Franklin, Massachusetts. He obtained this employment without seeking permission from the Department.

On June 11, 2001, Pelland testified that he telephoned Ms. Imbriglio in fulfillment of his regular check-in requirement with the Department. At the time of the call, Plaintiff was in Cape Cod, Massachusetts, delivering car parts for Astro. Ms. Imbriglio told Plaintiff that he was in violation of the Policy and instructed him to return to Rhode Island. Subsequently, the two met and Ms. Imbriglio reiterated that Plaintiff, by working at Astro, had violated the Policy and would not be permitted to continue working there. Plaintiff consequently resigned from his job at Astro.

In August 2002, Plaintiff made a request to travel to Florida in December 2002 to visit with family. The Department denied the request because it failed to fall into any of the exceptions to the Policy. Plain-

---

3. It is unclear whether the Department ever approved this request. Plaintiff testified that it did not, but ¶ 27 of the Stipulated Facts states that "a Probation/Parole counselor and Supervisor approved the request."

4. There is a sixth exception for employment as an out-of-state truck driver, which is more properly subsumed by the "employment" exception.

tiff also made a request dated March 27, 2003 to work at Astro which was eventually denied.

Plaintiff complains that there are no exceptions in the Policy for (1) casual, same-day travel out-of-state; (2) scheduled vacations out-of-state or visits with family or friends for anything except "emergencies"; (3) passing through a neighboring state on the way to Rhode Island; and (4) expediting the permit approval process for emergencies. There is also allegedly no notice or opportunity to be heard as to the application of the Policy—it applies to all "sex offenders," although the term is nowhere defined—and no consideration is given to date of conviction, unique circumstances of the offender or the offense, or the degree of danger posed by the offender.

Plaintiff filed this Complaint and Motion for Temporary Restraining Order and Preliminary Injunction in Rhode Island Superior Court alleging: (I) a violation of R.I. Gen. Laws § 42–35–1 and 42–56–7, in that Defendants promulgated the Policy without complying with applicable state law procedures; (II) a violation of the Rhode Island "State constitutional separation of powers," again as a result of the failure to follow state law procedures in promulgating the policy; (III) impairment of the right to travel in violation of the Equal Protection Clause of the Rhode Island Constitution; (IV) impairment of the right to travel in violation of the Equal Protection Clause of the U.S. Constitution, pursuant to 42 U.S.C. § 1983; (V) a violation of the Due Process Clause under the Rhode Island Constitution; (VI) a violation of the Due Process Clause of the U.S. Constitution, pursuant to 42 U.S.C. § 1983; (VII) imposition of an ex post facto law in violation of the Rhode Island

Constitution; and (VIII) imposition of an ex post facto law in violation of Article I, § 10 of the U.S. Constitution, brought pursuant to 42 U.S.C. § 1983. Defendants removed the action here, but Chief Judge Ernest C. Torres remanded Counts I and II to the Superior Court on December 6, 2001.[5]

## II. *Conclusions of Law*

The core of Plaintiff's claims concerns the operation of the Due Process and Equal Protection Clauses of the Fourteenth Amendment with respect to his right, as a sex offender on probation, to travel interstate.

A. *The Federal Due Process Clause: Do Probationers Have a Fundamental Right to Interstate Travel?*

■ The Due Process Clause[6] of the Fourteenth Amendment applies when government action deprives a person of liberty. *Greenholtz v. Inmates of the Nebraska Penal and Correctional Complex*, 442 U.S. 1, 7, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979). American citizens enjoy the constitutionally protected liberty to travel across state borders. *See Shapiro v. Thompson*, 394 U.S. 618, 629–30, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969) (all citizens have the liberty "to travel throughout the . . . land uninhibited by statutes, rules, or regulations which unreasonably burden or restrict this movement"). Ordinarily, a state may not impose restrictions on this fundamental right without demonstrating a compelling governmental interest in curtailing it. *Id.* at 634, 89 S.Ct. 1322.

■ A probationer, however, loses much of the liberty that he possessed prior to his

---

5. The action was transferred by Chief Judge Torres to the undersigned on December 4, 2002.

6. The Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.

criminal conviction. "[I]t is always true of probationers (as we have said it to be true of parolees) [7] that they do not enjoy 'the absolute liberty to which every citizen is entitled, but only ... conditional liberty properly dependent on observance of special [probation] restrictions.'" *Griffin v. Wisconsin*, 483 U.S. 868, 874, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987) (citing *Morrissey v. Brewer*, 408 U.S. 471, 480, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972)). Courts granting probation are constitutionally entitled to "impose reasonable conditions that deprive the offender of some freedoms enjoyed by law-abiding citizens." *United States v. Knights*, 534 U.S. 112, 119, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001).

Restrictions on interstate travel frequently are imposed upon probationers and parolees as a condition of freedom. Several courts have upheld these restrictions, finding that probationers and parolees have no constitutionally protected right to interstate travel for the balance of their sentences. *See, e.g., Williams v. Wisconsin*, 336 F.3d 576, 581 (7th Cir. 2003); *Alonzo v. Rozanski*, 808 F.2d 637, 638 (7th Cir.1986); *Bagley v. Harvey*, 718 F.2d 921, 924 (9th Cir.1983); *Rizzo v. Terenzi*, 619 F.Supp. 1186, 1189 (E.D.N.Y. 1985). These courts have explained that "an individual's constitutional right to travel, having been legally extinguished by a valid conviction followed by imprisonment, is not revived by the change in status from prisoner to parolee." *Bagley*, 718 F.2d at 924. If adopted here,[8] the approach of categorically denying a probationer the

right to interstate travel (referred to hereafter as the "categorical approach") would foreclose Plaintiff's substantive due process claims; if Plaintiff, as a probationer, has no right to interstate travel, he can claim no constitutional violation.[9]

Plaintiff argues that the cases espousing the categorical approach are "inapposite and otherwise unpersuasive" for three reasons: first, none involves the dispositive factual nuances presented here; second, the categorical approach is "contrary to binding Supreme Court and First Circuit precedent discussed above"; and third, the conclusions in *Saenz v. Roe*, 526 U.S. 489, 119 S.Ct. 1518, 143 L.Ed.2d 689 (1999) call into question any cases endorsing the categorical approach. Pl. Post–Trial Mem. at 7 n. 9.

None of these contentions is persuasive. First, there is nothing in Plaintiff's circumstances that distinguishes his case in any meaningful way from those in which the categorical approach was applied. It may be that Plaintiff at one time enjoyed greater freedom to travel to certain states for brief periods than was true in other cases, but that is merely (for Plaintiff) a lucky accident; it hardly suffices to reawaken his dormant constitutional right to travel interstate. To stake a cognizable claim to a constitutional right

> a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it.

---

7. Though "parolees enjoy even less of the average citizen's absolute liberty than do probationers," *United States v. Cardona*, 903 F.2d 60, 63 (1st Cir.1990), there is no discernable difference, for purposes of a constitutional right to interstate travel analysis, in the status of probationers and parolees.

8. There is no guidance from the First Circuit on this point.

9. To hold that probationers have no protectable right to interstate travel for the balance of their sentences is tantamount to saying that proscribing interstate travel for probationers is a presumptively reasonable condition of granting probation.

*Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). Plaintiff here has desire, and perhaps a need—but no entitlement.

Second, the Court is perplexed by the Plaintiff's reference to "binding Supreme Court and First Circuit precedent discussed above" allegedly disavowing the categorical approach. There is but one First Circuit decision cited in Plaintiff's post-trial brief—*United States v. Cardona,* 903 F.2d 60 (1st Cir.1990)—which stands for the irrelevant and unchallenged proposition that the Fourth Amendment is not violated when the government arrests a parolee in his home without a warrant, based on the parole officer's reasonable request. *Id. Cardona* in no way criticizes or repudiates the categorical approach.

Likewise, this Court has found no Supreme Court condemnation of the categorical approach, in *Saenz v. Roe* or elsewhere. *Saenz* dealt with the constitutionality of a California statute limiting the maximum welfare benefits allowable to newly arrived residents. 526 U.S. at 492, 119 S.Ct. 1518. At issue in *Saenz* was "the right of the newly arrived citizen to the same privileges and immunities enjoyed by other citizens of the same State." *Id.* at 502, 119 S.Ct. 1518. *Saenz* did not discuss the special situation of probationers or the type of casual travel that Plaintiff claims is his right. Other Supreme Court cases that have discussed circumstances more akin to those here have been either noncommittal or obliquely supportive of the categorical approach. *See, e.g., Smith v. Doe,* 538 U.S. 84, 101, 123 S.Ct. 1140, 155 L.Ed.2d 164 (2003) (contrasting the status of probationers and individuals subject to a

sex offender registration act, in that the latter, unlike probationers, "are free to move where they wish and to live and work as other citizens, with no supervision"); *Greenholtz,* 442 U.S. at 7, 99 S.Ct. 2100 ("There is no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence."); *Morrissey,* 408 U.S. at 483, 92 S.Ct. 2593 ("The State has found the parolee guilty of a crime against the people. That finding justifies imposing extensive restrictions on the individual's liberty.")[10]; *Jones v. Helms,* 452 U.S. 412, 419, 101 S.Ct. 2434, 69 L.Ed.2d 118 (1981) ("Despite the fundamental nature of this right [to interstate travel], there nonetheless are situations in which a State may prevent a citizen from leaving. Most obvious is the case in which a person has been convicted of a crime within a State.").

The absence of a definitive statement by the Supreme Court regarding the categorical approach perhaps explains the avalanche of Due Process Clause cases cited in the parties' briefs. Amid this vast collection, there are two cases that at least arguably support Plaintiff's claim that "[c]ourts have on numerous occasions recognized that convicted offenders on probation retain a constitutionally protected liberty interest in the right to [interstate] travel." Pl. Post–Trial Mem. at 6.

In *Berrigan v. Sigler,* 499 F.2d 514 (D.C.Cir.1974), two parolees in the District of Columbia who previously had been permitted to leave the District unsuccessfully sought leave from the Board of Parole to travel to North Vietnam. The parolees argued that the denial of their demand to travel to Hanoi violated their associational

---

**10.** *Morrissey,* a case that dealt with the revocation of parole altogether, contains a detailed examination of the "nature of the interest of the parolee in his continued liberty." 408 U.S. at 481–82, 92 S.Ct. 2593. The Court listed a "wide range" of activities available to the parolee (*e.g.,* employment, the freedom to be with family and friends and to "form the other enduring attachments of normal life"). Notably absent from the list is the right to travel unimpeded from state to state.

and free speech First Amendment rights, as well as their due process rights under the Fifth Amendment. After rejecting the First Amendment claim, the court held as follows as to the due process violation:

[P]arolees "are neither totally free men who are being proceeded against by the government for commission of a crime, nor are they prisoners being disciplined within the walls of a federal penitentiary. They stand somewhere between these two." This is not to say that parolees lose their constitutional rights, nor do prisoners in custody. But those rights of necessity are conditioned by the situation in which their convictions placed them.... And there is also a legitimate governmental interest in continuing means for information concerning a parolee's deportment and any necessity for closer supervision....

*Id.* at 522 (citations omitted). The *Berrigan* court held that the two reasons for denial proffered by the Board—a total lack of supervisory control over the parolees and the Board's policy not to approve foreign travel to an area where such travel is not in the national interest (as determined by the Secretary of State)—were adequately justified and not "unreasonable." *Id.* at 522–23. *Berrigan,* therefore, recognizes the right of parolees to interstate (or more accurately, international) travel, subject to the government's legitimate and reasonable interests in curtailing that right.

*McGregor v. Schmidt,* 358 F.Supp. 1131 (W.D.Wis.1973), goes a step further. McGregor, a parolee in Wisconsin, asked to be paroled in Oklahoma because he believed that a "nonlicensed person" could practice law there. The State of Wisconsin refused his request. The district court agreed with McGregor:

I hold that the right to travel is a ... fundamental interest. This does not mean that the state may not limit the geographical movement of those convicted of crime, but only that in a suit challenging the constitutionality of restrictions upon said persons' right to travel the court must require the defendants to show a compelling state interest in the restriction, and that the restriction is narrowly designed to serve that compelling governmental interest. I note that as the status of a person convicted of crime changes, for example, as an inmate in a maximum security institution becomes a parolee, a particular governmental interest in restricting his movements geographically may become less compelling; another, more; and a particular form of restriction may become too broad or too narrow.

*Id.* at 1134.

This Court disagrees with the holding of *McGregor* and finds it unsupportable. The Supreme Court has stated repeatedly that a state may impose greater restrictions on the liberty of probationers and parolees to travel interstate than on free persons. It defies reason then to apply the same standard of review to government restrictions on the right to interstate travel irrespective of an individual's criminal status. The "compelling governmental interest" standard is used when the freedom to travel interstate is abridged as to those who have not committed crimes. For probationers, the right of interstate travel necessarily exists, if at all, in a restricted and weakened condition; thus, a higher degree of deference (or a lower degree of scrutiny) is necessary with respect to the government's restrictions if the distinction between the convicted and the law-abiding is to mean anything.

This Court believes that the categorical approach is more analytically sound in these circumstances because it respects the difference between the guilty and the innocent. Plaintiff has acquired no entitle-

ment to travel interstate merely because the Department has agreed to grant him (provisionally) certain other liberties that he once possessed but surrendered upon conviction. Nor was Plaintiff's entitlement to interstate travel "revived" (if that is even possible) [11] because he was given the occasional privilege of casual travel. *Cf. United States v. Stanphill,* 146 F.3d 1221, 1223 (10th Cir.1998) ("The probation officer's decision to allow Defendant to travel outside the district did *not* modify the conditions of Defendant's supervised release. Just because Defendant was allowed to travel outside the district in the past does *not* entitle Defendant to travel outside the district in the future, or require the probation officer to grant Defendant permission to do so.") (emphasis in original). Even if Plaintiff, as a probationer, did possess some vestige of the right of interstate travel after his conviction (which this Court doubts), he signed a plea agreement that conditioned his ability to leave Rhode Island [12] on obtaining "permission of the court," which was widely understood to include the Department. He therefore had no right of interstate travel prior to the effective date of the Policy; in order to travel outside Rhode Island, he needed the approval of the Department. The Policy simply codified the standards by which

leave to travel interstate would be granted for sex offender probationers.

There are other reasons for adopting the categorical approach. A sentence of probation is not mandatory—there is no requirement that the defendant accept it. The defendant may insist upon incarceration if he finds the conditions of probation intolerable, either by refusing to sign his plea agreement or by violating the terms therein. Probation is a type of contract: the state foregoes a period of incarceration in consideration for the probationer's agreement to abide by court-imposed conditions that are less confining than prison. In this light, it makes little sense to derive Plaintiff's "right" of interstate travel from anywhere other than his plea agreement. Similarly, the state need not justify its decision to enforce its "contractual" rights as against the probationer. The prisoner himself has chosen probation over his jail cell and has agreed to the travel restriction as part of the deal. "There is a crucial distinction between being deprived of a liberty one has, as in parole, and being denied a conditional liberty that one desires." *Greenholtz,* 442 U.S. at 9, 99 S.Ct. 2100. However badly Plaintiff may wish to travel casually from state to state, the Constitution does not compel that he be permitted to do so.

---

**11.** *Lines v. Wargo,* 271 F.Supp.2d 649 (W.D.Pa.2003) is touted repeatedly by the Plaintiff, but it is difficult to see why; it endorses the categorical approach. *Id.* at 661 ("[A]s a general proposition, convicted persons (including parolees) enjoy no fundamental right to travel."). The *Lines* court faced an Equal Protection Clause challenge and found that the plaintiff-parolee's right to interstate travel had been "revived" by the fact that his parole had been officially transferred from Maryland to Pennsylvania. *Id.* at 661–62.

Though this Court is skeptical of the conclusion that the right of interstate travel may be revived in probationers by anything other than completion of sentence, it need not con-

front that issue here. *Lines* is distinguishable from Plaintiff's situation: the Department has not transferred Plaintiff's probationary status to a different state, nor has it taken any official affirmative act to recognize Plaintiff's right to travel interstate.

**12.** Plaintiff argues that the relatively small geographic size of Rhode Island and its proximity to Massachusetts necessitate "more liberal and frequent interstate travel" for Rhode Island's probationers. Pl. Post–Trial Mem. at 8 n. 12. The Court rejects this contention. Plaintiff chose to commit his crime in Rhode Island. He may regret that he did not select a larger state, but that is not this Court's concern.

■ While this Court has adopted the categorical approach, it is worth noting that Plaintiff's due process claims falter under the test applied by *Berrigan v. Sigler* as well. "Sex offenders are a serious threat in this Nation.... When convicted sex offenders reenter society, they are much more likely than any other type of offender to be rearrested for a new rape or sexual assault." *McKune v. Lile*, 536 U.S. 24, 32–33, 122 S.Ct. 2017, 153 L.Ed.2d 47 (2002) (plurality opinion). The Department has a legitimate interest in retaining a certain degree of supervisory control over Plaintiff, and the strictures of the Policy are a reasonable way of furthering those aims. Moreover, the Policy does not proscribe interstate travel altogether; it merely imposes various conditions that the Department has deemed useful for monitoring the movements of sex offenders on probation. Recognizing that adequate supervision is a vital component of an effective system of probation and that the Department has limited resources with which to keep track of its charges, the Court finds that the limitations on interstate travel established by the Policy serve a legitimate governmental interest and are reasonable.

■ Of course, the finding that Plaintiff has no constitutional entitlement to interstate travel renders his allegations of a procedural due process deprivation moot. Unlike the situation in *Morrissey v. Brewer*, the Department did not revoke Plaintiff's probation altogether; if it had, Plaintiff's rights would have been violated without an "informal hearing." 408 U.S. at 484, 92 S.Ct. 2593. But because the Policy did not deprive Plaintiff of any liberty interests, he was not due any procedural safeguards with respect to the change in policy. In consequence, Plaintiff's federal substantive and procedural due process claims fail.

B. *The Federal Equal Protection Clause*

"No State shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The Equal Protection Clause's primary aim is to ensure that "all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). It is hornbook law that the application of the Equal Protection Clause depends upon the class of persons or the interest affected by the law at issue. Laws impacting "suspect" classifications or "fundamental" rights are subject to strict scrutiny (or intermediate scrutiny in the case of quasi-suspect classifications such as sex); laws that impact neither need only be rationally related to legitimate governmental interests.

Plaintiff advances two equal protection theories: first, that the right of interstate travel is fundamental and that strict scrutiny is therefore the appropriate test; and second, that sex offender probationers are subject (unjustly) to greater interstate travel restrictions under the Policy than are other probationers (including those who have committed serious crimes such as murder, armed robbery and kidnapping). The first theory is easily dismissed. This Court has held that probationers have no fundamental right of interstate travel for the balance of their sentences; without a right of interstate travel, there is no equal protection violation.

■ As to the second theory, sex offenders on probation (or, for that matter, probationers in general) are not a suspect or quasi-suspect classification. *See Roe v. Farwell*, 999 F.Supp. 174, 194 (D.Mass. 1998). In order to justify the classification drawn by the Policy, the Department need only show that the increased interstate travel restrictions on sex offender proba-

tioners are rationally related to a legitimate governmental interest. Plaintiff's burden is ponderous: as long as the connection between the Policy's classification and the government interest is not "so attenuated as to render the distinction arbitrary or irrational," Plaintiff's equal protection claim will fail. *Cleburne,* 473 U.S. at 446–47, 105 S.Ct. 3249.

■ The necessary nexus plainly has been demonstrated. The parties have stipulated that the Policy purposes to promote community safety and compliance with the laws in other states governing the interstate travel of sex offenders. Moreover, as noted earlier, the restraints imposed by the Policy serve to improve the ability of the Department to oversee the movements of sex offender probationers. There is little doubt that greater supervisory authority (which does not eliminate wholesale a sex offender probationer's right to travel) over these probationers in particular, and greater restrictions over their geographic mobility out-of-state, are goals reasonably related to the government's legitimate interest in protecting the public.

C. *The Federal Ex Post Facto Clause*

■ "The law (or a judicial decree) violates the Ex Post Facto Clause if it 'changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed.'" *United States v. Amirault,* 224 F.3d 9, 14 (1st Cir.2000) (citing *Calder v. Bull,* 3 U.S. (3 Dall.) 386, 390, 1 L.Ed. 648 (1798)); *see also Garner v. Jones,* 529 U.S. 244, 249–250, 120 S.Ct. 1362, 146 L.Ed.2d 236 (2000) ("One function of the *Ex Post Facto* Clause is to bar enactments which, by retroactive operation, increase the punishment for a crime after its commission."). A state that implements retroactive changes in laws governing parole or probation of prisoners may sometimes violate

this precept, but "not every retroactive procedural change creating a risk of affecting an inmate's terms or conditions of confinement is prohibited." *See id.* at 250, 120 S.Ct. 1362. The "controlling inquiry" is whether the retroactive application of the Policy creates " 'a sufficient risk of increasing the measure of punishment attached to the covered crimes.' " *Id.* (citing *California Dept. of Corrections v. Morales,* 514 U.S. 499, 509, 115 S.Ct. 1597, 131 L.Ed.2d 588 (1995)). Most crucially for this case:

> [T]he *Ex Post Facto* Clause should not be employed for "the micromanagement of an endless array of legislative adjustments to parole and sentencing procedures." ... The States must have due flexibility in formulating parole procedures and addressing problems associated with confinement and release.

*Id.* at 252, 120 S.Ct. 1362 (citing *Morales,* 514 U.S. at 508, 115 S.Ct. 1597).

■ The Policy itself states that it is intended to promote community safety and consistency with the policies of other states governing the same subject. "[A]n imposition of restrictive measures on sex offenders adjudged to be dangerous is 'a legitimate nonpunitive governmental objective and has been historically so regarded.' " *Smith v. Doe,* 538 U.S. at 93, 123 S.Ct. 1140 (citing *Kansas v. Hendricks,* 521 U.S. 346, 363, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997)).

Moreover, prior to the implementation of the Policy, Plaintiff was required by his plea agreement to seek permission from the sentencing court or the Department in order to leave Rhode Island. By formalizing the conditions under which the court or the Department could grant such permission, the Policy did not increase retroactively the measure of Plaintiff's punishment. Plaintiff had expressly renounced his right to leave Rhode Island without the

government's say-so. For a time, he was granted the boon of limited interstate travel at his discretion; but that was never his right. When the Department held him to his plea agreement by instituting the Policy, it did no more than enforce the terms of that agreement. "Any sensible application of the *Ex Post Facto* Clause, and any application faithful to its historic meaning, must draw a distinction between the penalty that a person can anticipate for the commission of a particular crime, and opportunities for mercy or clemency that may go to the reduction of the penalty." *Garner,* 529 U.S. at 258, 120 S.Ct. 1362 (Scalia, J., concurring). The Policy does not penalize Plaintiff retroactively; there is no Ex Post Facto Clause violation.

**D.** *Due Process, Equal Protection, and Ex Post Facto Violations of the Rhode Island Constitution*

Plaintiff's claims under the Rhode Island Constitution mirror those asserted under the U.S. Constitution. The analysis is identical. *See L.A. Ray Realty v. Town Council of the Town of Cumberland,* 698 A.2d 202, 218 (R.I.1997) (Flanders, J., concurring) (purpose of the 1986 Amendment to the Rhode Island Constitution was to incorporate exactly the same "due process protections that are part of the Fourteenth Amendment to the United States Constitution"); *Rhode Island Insurers' Insolvency Fund v. Leviton Mfg. Co., Inc.,* 716 A.2d 730, 734 (R.I.1998) ("Because the[ ] provisions [of the federal and state Equal Protection Clauses] provide for similar protections, a separate analysis is unnecessary."); *Taylor v. State of Rhode Island,* 101 F.3d 780, 782 (1st Cir.1996) ("As the Rhode Island Supreme Court has held that Federal Ex Post Facto Clause jurisprudence likewise guides the required analysis under the Rhode Island Constitution, *Lerner v. Gill,* 463 A.2d 1352, 1356 (R.I.1983) . . . these claims merge.").

For the reasons set forth in the discussion of Plaintiff's federal constitutional claims, the Court likewise holds that Plaintiff has not established a violation of the Due Process, Equal Protection, or Ex Post Facto Clauses of the Rhode Island Constitution.

**IV.** *Conclusion*

Based on the foregoing analysis, the Court finds in favor of Defendants and against Plaintiff on all claims. Judgment shall enter accordingly.

IT IS SO ORDERED.